### Select Design, Ltd., Kevin Owens, Jeffrey Beer and Glen Cousins v. Union Mutual Fire Insurance Company

[674 A.2d 798]

No. 95-203

Present: **Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed March 22, 1996

*Shapleigh Smith, Jr.*, of *Dinse, Erdmann & Clapp*, Burlington, for Plaintiffs-Appellants.

*Bruce C. Palmer* of *Downs Rachlin & Martin, P.C.*, St. Johnsbury, for Defendant-Appellee.

**Dooley, J.** Plaintiffs, Select Design, Ltd. (SDL) and certain of its officers and employees, sought a declaration that defendant Union

Mutual Fire Insurance Co. owes them a duty to defend an action brought against them by RMH Associates, Inc. (RMH), pursuant to a business owner's liability policy defendant issued to SDL. Plaintiffs appeal from an order of the Chittenden Superior Court granting defendant's motion for summary judgment and denying plaintiffs' cross-motion for partial summary judgment. We affirm.

SDL is in the custom design screen-printing business in Burlington, and in March 1994 hired Glen Cousins, sales manager of RMH, SDL's competitor in Burlington. At the time, SDL was covered by a business owners' liability insurance policy issued by defendant. Cousins stopped working for RMH on March 7, 1994 and immediately began working for SDL.

On March 10, 1994, RMH sued SDL, along with its president, secretary, and Cousins, in Chittenden Superior Court, alleging that, on leaving RMH, Cousins took with him proprietary information, including a customer list, and then tried to lure RMH customers to SDL using the proprietary information he had taken. The RMH complaint specifically alleged breach of contract, tortious interference with contractual relations, breaches of fiduciary duties by Cousins before and after leaving RMH's employ, unlawful destruction of commercial opportunity by disrupting a private stock offering, and fraud. It requested both injunctive relief and damages.

SDL notified defendant of the RMH lawsuit and requested that it defend and indemnify them all in that suit. Defendant denied coverage, refusing to defend or indemnify SDL and its officers. Plaintiffs thereafter sought a declaration that defendant owes a duty to defend and indemnify them in the RMH action.

The policy provides coverage for "bodily injury," "property damage," "personal injury," and "advertising injury." Plaintiffs' main theory was that RMH's damages, if any, arise out of an advertising injury. Plaintiffs also argued that RMH's allegation of unexpected and unintended property damage triggered a duty to defend under the coverage for property damage. Finally, plaintiffs argued that RMH's suit also fell under the policy's "personal injury" coverage.

Defendant moved for summary judgment on the ground that it had no obligation to defend or indemnify plaintiffs because there was no coverage under any of the pertinent policy provisions. The court ruled that no "advertising," as that term is commonly understood, had been alleged in RMH's suit. As to the personal injury and property damage claims, it ruled that neither involved an "accident," as required by the policy, which the court defined as an unexpected happening without

intention and design. The court granted defendant's motion for summary judgment, and the present appeal followed.

■ We have decided a number of recent cases involving insurance coverage disputes that come to us on appeal from the grant of summary judgment to the insurer, and the basic principles governing such disputes are clear. See, e.g., *City of Burlington v. Associated Elec. & Gas Ins. Servs.*, 164 Vt. 218, 669 A.2d 1181 (1995); *Nationwide Mut. Fire Ins. Co. v. Lajoie*, 163 Vt. 619, 661 A.2d 85 (1995) (mem); *Winn v. Becker*, 163 Vt. 615, 660 A.2d 284 (1995) (mem); *City of Burlington v. National Union Fire Ins. Co.*, 163 Vt. 124, 655 A.2d 719 (1994). The duty to defend is broader than the duty to indemnify and is generally determined by comparing the allegations of the complaint in the underlying suit to the coverage terms in the policy. *National Union*, 163 Vt. at 127, 655 A.2d at 721. "If any claims are potentially covered by the policy, the insurer has a duty to defend." *Id.* Otherwise, it does not. *Id.*

■ We construe the policy according to its terms and the evident intent of the parties as expressed therein. *Id.* "Disputed terms should be read according to their plain, ordinary and popular meaning." *Id.* at 127-28, 665 A.2d at 721. We will strictly construe the insurance contract against the insurer, but will not deprive the insurer of the protection of unambiguous terms placed in the policy for its benefit. See *Suchoski v. Redshaw*, 163 Vt. 620, 622, 660 A.2d 290, 292 (1995).

■ "Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, after giving the benefit of all reasonable doubts and inferences to the nonmoving party." *National Union*, 163 Vt. at 127, 655 A.2d at 721; see V.R.C.P. 56. The standard on appeal is the same as that used by the trial court.

## I. Advertising Injury

With these principles in mind, we address the plaintiffs' arguments, beginning with their claim that the complaint against them alleges an advertising injury. Although the policy does not define "advertising," it defines "advertising injury" for purposes of the policy. To trigger "advertising injury" coverage, a suit must allege an injury "in the course of advertising [the insured's] goods, products or services" that stems from one of four "offenses" defined in Section F of the policy:

> **1. "Advertising Injury"** means injury arising out of one or more of the following offenses:

a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

b. Oral or written publication of material that violates a person's right of privacy;

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title or slogan.

The parties agree that plaintiffs have two hurdles to overcome in establishing the duty to defend: (1) the alleged injury must have arisen in the course of plaintiffs' "advertising," and (2) the injury must have been caused by one of the offenses listed in the policy.

Plaintiffs argue with respect to the first hurdle that the term advertise is broad enough to encompass solicitation, and the underlying lawsuit charged Cousins with soliciting customers from RMH's customer list. With respect to the second hurdle, plaintiffs argue that two offenses are implicated by the conduct alleged in the complaint against them: (a) the "misappropriation of advertising ideas" caused by the alleged improper use of RMH's customer lists to solicit customers for SDL; and (b) disparagement of RMH's "goods, products or services," which necessarily occurred when Cousins allegedly induced RMH customers to switch to SDL. We address only whether the injury arose in the course of advertising.

Although the term "advertising" is not defined in the policy, it has been defined in case law as "the widespread distribution of promotional material to the public at large." *International Ins. Co. v. Florists' Mut. Ins. Co.*, 559 N.E.2d 7, 10 (Ill. App. Ct. 1990). Other courts have endorsed substantially the same definition. See, e.g., *Playboy Enters. v. St. Paul Fire & Marine Ins. Co.*, 769 F.2d 425, 428 (7th Cir. 1985) ("action of calling something (as a commodity for sale, a service offered or desired) to the attention of the public especially by means of printed or broadcast paid announcements") (quoting Webster's Third New International Dictionary of the English Language Unabridged 31 (1963)); *MGM, Inc. v. Liberty Mut. Ins. Co.*, 839 P.2d 537, 540 (Kan. Ct. App. 1992) (term "advertising" in policy meant "public or at least widely disseminated solicitation or promotion"), *aff'd*, 855 P.2d 77 (Kan. 1993); *Monumental Life Ins. Co. v. United States Fidelity & Guar. Co.*, 617 A.2d 1163, 1173 (Md. Ct. Spec. App.) ("[T]he plain meaning of the term 'advertising' to a reasonably

prudent person is *not* susceptible of more than one meaning, and encompasses only the 'public' sense of the word"), *cert. denied*, 624 A.2d 491 (1993); *Smartfoods, Inc. v. Northbrook Property & Casualty Co.*, 618 N.E.2d 1365, 1368 (Mass. App. Ct. 1993) ("a public announcement to proclaim the qualities of a product or point of view"); *Fox Chem. Co. v. Great Am. Ins. Co.*, 264 N.W.2d 385, 386 (Minn. 1978) (term "advertising" contemplates public or widespread distribution of material); *First Bank & Trust Co. v. New Hampshire Ins. Group*, 469 A.2d 1367, 1368 (N.H. 1983) (mere explanation of bank services to couple in private office is not considered advertising).

Many of these cases deal with fact patterns legally indistinguishable from the one before us. In *Monumental Life Ins. Co.*, the insured was itself an insurance company accused of pirating employees from a competitor, misusing trade secrets and confidential information from the competitor, and telling the competitor's policyholders that the competitor was having financial difficulties and could not afford to pay its claims. 617 A.2d at 1165-67 & n.5. Making arguments virtually identical to those made by plaintiffs here, the plaintiff in *Monumental* argued that an advertising injury was alleged. The court held that one-to-one sales activity by the plaintiff's agents, which induced customers to switch coverage to the plaintiff, was not advertising: "[A]dvertising and solicitation [are] . . . mutually exclusive, the difference being that advertising must be of a public nature." *Id.* at 1173.

In *Smartfoods*, the plaintiff, a producer of snack foods, was sued when it terminated all its distribution contracts. 618 N.E.2d at 1366. The distributors alleged breach of contract, unfair trade practices, tortious interference with contractual relations and misappropriation of trade secrets. The plaintiff sought insurance coverage by characterizing its letters soliciting distributors as advertising and arguing that the complaint against it alleged injuries from advertising activities. *Id.* at 1368. The court rejected the argument, reasoning "a proposal to a particular company to do business together does not conform to ordinary notions of calling to the attention of the public the merits of a product," and added "[w]e doubt that every pitch made by one businessman in a letter to another constitutes advertising as the word is understood in American usage." *Id.*

Plaintiffs rely on a small number of federal district court cases that define "advertising" more broadly than those in the majority of precedents. See *New Hampshire Ins. Co. v. Foxfire, Inc.*, 820 F. Supp. 489 (N.D. Cal. 1993); *Merchants Co. v. American Motorists Ins. Co.*,

794 F. Supp. 611 (S.D. Miss. 1992); *John Deere Ins. Co. v. Shamrock Indus.*, 696 F. Supp. 434 (D. Minn. 1988). The most expansive definition is in *John Deere Ins. Co.* under a policy defining "advertising injury" in nearly the same words as those in the policy before us. There, the insured wrote letters to a single buyer soliciting sale of a machine that the insured allegedly misappropriated from a former employer. The court held that "[w]hile activity directed at one customer seems to stretch the meaning of advertising, Black's Law Dictionary's definition of 'advertise' encompasses any form of solicitation, presumably including solicitation of one person." 696 F. Supp. at 440. *Foxfire* embraced a modified version of the broad interpretation in *John Deere*, holding that where the insured had solicited the entire customer base of the company which sued it, approximately twenty-two to thirty-one customers, there was advertising activity. 820 F. Supp. at 494. *Merchants Co.* held that where the insured is alleged to have improperly used another company's customer list to send a flyer to some of the other company's customers, the unlawful conduct was committed "in the course of advertising." 794 F. Supp. at 619.

For three reasons, we adopt the majority view and reject the interpretation of advertising offered by plaintiffs. First, we cannot agree that the three federal court cases are persuasive. We note that even the *John Deere* court acknowledged that its interpretation "seems to stretch the meaning of advertising." 696 F. Supp. at 440; see also *Smartfoods*, 618 N.E.2d at 1368 (*John Deere* is "unpersuasively reasoned"). Although we strictly construe the policy provisions against the insurer, we must read the policy provisions according to their plain, ordinary meaning. The majority view does so. Our conclusion is not undercut by the fact that there is some disagreement among courts as to the proper meaning of advertising. See *Peerless Ins. Co. v. Wells*, 154 Vt. 491, 495, 580 A.2d 485, 488 (1990) (ambiguity not established by differences in conclusions reached by courts where alternative is based on forced reading of policy language).

Second, we find little congruity between the definition of "advertising" offered by plaintiffs and the definition of "advertising injury" set out in the policy before us. The term "advertising injury," as defined in the offenses set out in the policy, and as construed in an overwhelming majority of reported cases, is injury to another that results from the *content* of statements about the products or services of the insured. Thus, in Section F.1.a., the offense is advertising that results in libel or slander: for example, an advertisement that

disparages a product. See, e.g., *Collier County Publishing Co. v. Chapman,* 318 So. 2d 492 (Fla. Dist. Ct. App. 1975), *cert. denied,* 333 So. 2d 462 (1976); Restatement (Second) of Torts §§ 623A-630 (1977). Section F.1.b., concerning invasions of privacy, might, for example, relate to an advertisement that includes a photograph or statement of a person who has not authorized publication of the likeness or the implied endorsement of the product. See, e.g., *Staruski v. Continental Tel. Co. of Vt.,* 154 Vt. 568, 581 A.2d 266 (1990). Section F.1.d. speaks to advertisements that appropriate the trademark of a competitor and thus trade on its reputation and advertising efforts. See, e.g., *Bank of the West v. Superior Court,* 833 P.2d 545, 551 (Cal. 1992).

Plaintiffs' theory seeks coverage for the fact that advertising occurred and not for the content of that advertising. Plaintiffs rely on the definition of "advertise" in Black's Law Dictionary 50 (5th ed. 1979): "To advise, announce, apprise, command, give notice of, inform, make known, publish. On call to the public attention by any means whatsoever. Any oral, written, or graphic statement made by the seller in any manner in connection with the solicitation of business . . . ." Plaintiffs reason that under such definition "solicitation" constitutes "advertising." But the definition is clear that it is the *statement* made in connection with solicitation that is the advertisement. Again, we must manipulate the policy language inappropriately to accommodate the theory.

Third, plaintiffs' theory involves a very weak causal relationship between the advertising and the injury. In *Bank of the West v. Superior Court,* 833 P.2d at 559, the California Supreme Court examined the precedents around the country and concluded that "the apparent majority rule, under which 'advertising injury' must have a causal connection with 'advertising activities,' best articulates the insured's objectively reasonable expectations about the scope of coverage." See also *A. Meyers & Sons Corp. v. Zurich Am. Ins. Group,* 545 N.E.2d 1206, 1208 (N.Y. 1989). The court found that this rule fits best with the policy language and limits advertising injury coverage, which would otherwise extend to most claims related to an insured's business. *Bank of the West,* 833 P.2d at 560. We agree.

There is virtually no causal connection here between the alleged injury and the alleged advertising. RMH alleged that Cousins left its employ, taking with him proprietary information such as the customer list, existing orders, pending quotes and customer art work to use on behalf of SDL to take customers away from RMH. The only

relationship between the injury and advertising is that Cousins had to somehow contact these customers to steal them from RMH. If the act of contacting potential customers is advertising for purposes of the policy, then any dispute related to economic competition among businesses is covered by the policy provision for advertising injury.

Having adopted defendant's interpretation of "advertising," we conclude that no advertising is alleged in the complaint against plaintiffs. There is no allegation of distribution of promotional material to the public at large. Instead, the only allegation is that SDL solicited RMH's customers, which does not amount to advertising. The superior court was correct in awarding summary judgment to defendant on this coverage theory.

## II. Property Damage and Personal Injury

Plaintiffs next argue that its complaint presented a genuine issue of material fact as to whether the RMH complaint alleged "property damage" within the meaning of the policy. The policy provides coverage for property damage where it is caused by an "occurrence." It defines "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." It defines "property damage" to include either "[p]hysical injury to tangible property" or "[l]oss of use of tangible property." Plaintiffs argue that they were alleged to have taken tangible property, that is, the customer list and customer artwork. They further argue that there is an issue of fact as to whether any injury to RMH was expected or intended and thus an "accident."

We hold that the RMH complaint does not allege an accident and therefore does not allege an occurrence as required for coverage. Accordingly, we do not reach whether the RMH complaint alleges a loss of use of tangible property.

This case is controlled by our decision in *City of Burlington v. National Union Fire Ins. Co.* In that case, the city was sued by wood chip suppliers for its electric generating plant. The suit alleged that the city failed to purchase the volume of wood chips called for in its contract with the suppliers and this failure had devastating economic impact on the suppliers. It sought damages on theories of breach of contract, economic duress, deceit, and the tort of insult and oppression. The city sought insurance coverage for the suit, arguing the complaint alleged an accident because the city did not expect or intend the resulting harm. 163 Vt. at 128, 655 A.2d at 721. Based on policy language virtually identical to that in the present case, the city

had to show that the suppliers alleged an "accident." We held that the city failed to make that showing:

> Here, it cannot be said that Burlington intended no injury to the plaintiffs . . . . Burlington intended or expected economic injury to the wood chip suppliers when it reduced its purchases from them.

> The distinction Burlington draws is unworkable and would result in a duty to defend in virtually any commercial contractual dispute. No doubt Burlington took the actions it did because of its economic interests in the electricity generation business. There is no reason that it, or more properly its managers, would have precise knowledge of the amount or nature of the damage it might inflict on others as a consequence of its business actions. To determine whether there is a duty to defend based on such knowledge is arbitrary, far afield from any common-sense definition of accident.

*Id.* at 129, 655 A.2d at 722.

The case for coverage is the same here as in *National Union.* The underlying complaint alleges that SDL and its officers induced Cousins to leave RMH, bringing with him as much proprietary information as possible. It alleges Cousins left and used the proprietary information to induce RMH's customers to break their contracts with RMH and enter into contracts with SDL. It alleges that SDL and its officers knew this was a sensitive time for RMH because of a private stock offering, and SDL hoped to use the Cousins information to put RMH out of business. Finally, it alleges Cousins fraudulently executed contracts for RMH for the purpose of switching them to SDL contracts.

None of the alleged conduct constitutes an accident. The whole purpose of the alleged conduct is economic benefit to SDL at the expense of RMH. The fact that SDL and its officers may not know the extent of the harm that would result is irrelevant. Defendant had no duty to defend or indemnify based on a property damage theory, and summary judgment was appropriate.

Plaintiffs' final contention is that coverage exists for "personal injury." Specifically, plaintiffs argue that the complaint against them necessarily alleges that they disparaged RMH's products to take its customers away. Thus, they argue the complaint allegations fit within

one of the offenses the policy considers part of personal injury: "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." The policy covers personal injury only if it is caused by an "occurrence," however, and the definition of occurrence is the same for personal injury and property damage. As a result, this contention again fails for want of an "occurrence."

Moreover, the RMH complaint does not allege that plaintiffs disparaged RMH's products or services. For plaintiffs to argue that Cousins necessarily disparaged the goods and services of RMH in soliciting business from RMH customers is to contend that all comparison-based advertising is actionable and that Cousins necessarily went over the line of protected commercial speech. Disparagement in this context does not simply mean comparing a competitor's product or service unfavorably with one's own, but must constitute an "injurious falsehood" to be actionable. W. Keeton, et al., Prosser and Keeton on the Law of Torts § 128, at 964 (5th ed. 1984). There were no such allegations in the RMH complaint.

*Affirmed.*